UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____X

THOMAS SANTORELLI,

                Plaintiff,

        - against -

**OPINION AND ORDER**
06-CV-284 (SJF)

MICHAEL J. ASTRUE,[1] COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.

_____X

FEUERSTEIN, J.

I.    Introduction

On January 23, 2006, *pro se* plaintiff Thomas Santorelli ("Plaintiff" or "Santorelli")

commenced this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of

the Commissioner of Social Security ("the Commissioner") that he was ineligible for disability

insurance benefits and supplemental security income for the period of February 1980 through

September 1996. The Commissioner now moves for judgment on the pleadings pursuant to Fed.

R. Civ. P. 12(c) affirming his final decision. For the reasons set forth below, the

Commissioner's motion is denied and this case is remanded to the Commissioner for further

proceedings.

---

[1] In filing his complaint, Plaintiff named former Commissioner of Social Security Jo Anne B. Barnhart as defendant. However, Michael J. Astrue, has succeeded Jo Anne B. Barnhart as Commissioner of Social Security. The Court substitutes Michael J. Astrue for Jo Anne B. Barnhart as a party in this action. See Fed. R. Civ. P. 25(d)(1) ("When a public officer is party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party . . . An order of substitution may be entered at any time, but the omission of such an order shall not affect the substitution."). The Clerk of the Court is directed to amend the docket sheet in this case accordingly.

II.    Plaintiff's Pleadings

A *pro se* plaintiff's submissions are held "to less stringent standards than formal pleadings drafted by lawyers . . . ." Hughes v. Rowe, 449 U.S. 5, 9 (1980) (quoting Haines v. Kerner, 404 U.S. 519, 520 (1972)). A court must "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'" McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). Nonetheless, a *pro se* plaintiff is not exempt from compliance with relevant rules of procedural and substantive law. Faretta v. California, 422 U.S. 806, 834 n.36 (1975).

III.    Background

A.    Administrative Proceedings

In December 1982 (R. at 85)[2] Plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") (R. at 18), claiming that he was disabled beginning in February 1980 (R. at 89). The applications were denied in January 1983. Plaintiff subsequently filed for DIB and SSI in June 1999 and was found entitled to benefits commencing September 1, 1996 (R. at 98, 99).

Pursuant to class action settlements in Dixon v. Shalala, 792 F. Supp. 942 (S.D.N.Y. 1992), aff'd, 54 F.3d 1019 (2d Cir. 1995) and Stieberger v. Sullivan, 792 F. Supp. 1376, modified, 801 F. Supp. 1079 (S.D.N.Y. 1992), the Social Security Administration ("SSA") informed Plaintiff that he was entitled to reopen claims for the period of February 27, 1980 through August 31, 1996 (R. at 38, 42-43, 100). Upon reconsideration, SSA denied Plaintiff's claims pursuant to Stieberger based upon insufficient evidence of the severity of Plaintiff's condition. (R. at 38-39, 42-44, 48). Plaintiff's claims under Dixon were also denied based upon

---

[2] "R." refers to the administrative record filed with the Court by the Commissioner.

2

SSA's determination that he had engaged in "7 or more months of SGA [substantial gainful activity] following the Dixon denial" (R. at 40, 45).

Plaintiff requested a hearing before an Administrative Law Judge, which took place before Emanuel Poverstein ("the ALJ") via telephone on May 15, 2002 (R. at 102-14). The ALJ advised Plaintiff of his right to counsel, but Plaintiff elected to proceed *pro se* (R. at 104). Plaintiff was the sole witness at the hearing. On May 31, 2002, the ALJ issued a decision finding that Plaintiff was not disabled from February 1980 through August 1996 and therefore ineligible for benefits during that period (R. at 17-21).

On March 31, 2005, based upon the SSA's Appeals Council's denial of Plaintiff's request for review (R. at 12), the ALJ's decision became the final decision of the Commissioner (R. at 8). This action followed.

B.    Facts

1.    Non-Medical Evidence

Santorelli was born in 1956, completed eleventh grade, and received a general equivalency degree and an associate's degree in communications (R. at 107). Prior to 1980, he worked as a junior engineer in aircraft electronics (R. at 108). In or around 1980, a chemical spill[3] at his worksite exposed Santorelli to butyl acetate solvent (R. at 49). While he spent only one (1) night in the hospital after the accident, his continued work in industrial environments exacerbated his condition, leaving him particularly vulnerable to allergens as one (1) of his lungs was scarred (or tented) in the chemical spill (R. at 49, 112). By mid-1980, he was unable to work and sought continued medical attention (R. at 50).

---

[3] There is some confusion about the year of the chemical spill (see, e.g., Def.'s Br. 3, 4; R. at 49, 50, 60, 108, 112).

Santorelli did not work from some point in mid-1980 through 1985 (R. at 37, 108). Santorelli testified at his hearing that "around [19]87" he began working again, but was self-employed because "[his] body was kind of undependable" and therefore "[he] couldn't really work for anyone else cause . . . you can't have it one day you're feeling good then three days of not feeling well" (R. at 108). SSA records[4] show that he had income from 1986 through 1991 (R. at 37).

In 1995, Santorelli accidentally ingested mold,[5] exacerbating his condition (R. at 31, 70). In 1999, SSA determined that Santorelli was disabled due to an "anxiety related disorder" beginning in September 1996 (R. at 98).

### 2.      Medical Evidence

The majority of the medical evidence in this case consists of six (6) pages of what appear to be excerpts of a series of workers' compensation forms completed between 1980 and 1983 by Santorelli's doctor, George Congram.

Initially, based upon examinations in March and April 1980, Dr. Congram concluded that Santorelli was partially disabled, based upon diagnoses of "chemical sensitivities" and "adrenal stress syndrome," but that the injuries would not result in permanent restrictions (R. at 55). The diagnosis of "adrenal stress syndrome" was based upon Santorelli's abnormal adrenal function as indicated by low levels of urinary ketosteroids and ketogenic steroids (R. at 55).[6] The doctor advised Santorelli to avoid contaminated worksites (R. at 55).

---

[4] SSA provided Santorelli's Federal Insurance Contributions Act ("FICA") earnings summary (R. at 37).

[5] There is a discrepancy in the record of whether he ingested contaminated food or drink (see R. at 31, 70).

[6] Throughout his notes, Dr. Congram cites specific levels of urinary steroids as the basis for his diagnosis of adrenal stress syndrome (R. at 50, 51, 52, 54, 55).

In August 1980, Dr. Congram noted that Santorelli was irritable, restless, distractible and had "quite low" adrenal functioning (R. at 54), but that he could engage in physical activity on the job to a limited extent, as long as he was not in a contaminated environment (R. at 55). In September 1980, Dr. Congram recommended that Santorelli avoid extreme temperatures, sudden temperature variations, and "high places," and any environment where contaminants or irritants, including, dust, odors, humidity, or noise, were present (R. at 54).

In reports of December 1980 and May 1981, Dr. Congram reiterated his conclusion that Santorelli was suffering from adrenal stress syndrome and that Santorelli should not engage in physical activity in the presence of contaminants (R. at 51, 52).

In November 1981, Dr. Congram noted that Santorelli could return to work full-time in a non-contaminated environment (R. at 53). Dr. Congram found that Santorelli had low adrenal functioning, adrenal stress syndrome, and sensitivities to chemicals in September and November 1982 and May 1983, but did not alter his finding that Santorelli could work in an non-contaminated environment (R. at 50-51).

Dr. Congram died in the mid-1980s.[7] Santorelli began treatment with Dr. Frederick Larmor in 1985 (R. at 23). In April 1988,[8] Dr. Larmor wrote a report in which he stated that based upon his review of Dr. Congram's reports, as well as the report of a pulmonary specialist, Santorelli had allergic diathesis and bronchial asthma, which were aggravated by the chemical spill at his workplace (R. at 49). Dr. Larmor noted that Santorelli's "allergic diathesis has . . . consisted of urticaria, fatigue, migraine headaches, allergy to Penicillin, allergy to wheat, allergy to nail polish and cosmetics, as well as sinusitis" (R. at 49). Based upon a 1985 x-ray, Dr.

---

[7] The record contains various years as the date of Dr. Congram's death, including 1984 (R. at 61, 71), 1985 (R. at 71) and 1987 (R. at 23).

[8] There is a five (5) year gap in the record.

Larmor concluded that there were "fibrotic changes with some tenting at the base of [Santorelli's] right lung," indicating a chronic process (R. at 49). Dr. Larmor noted that "with this predisposition and sensitivity a person can be severely incapacitated by exposure to such potentially toxic, chemical substances" (R. at 49).

In November 1999, more than eleven (11) years after Dr. Larmor's report, Dr. N. Shliselberg, a state agency medical consultant, evaluated Santorelli and concluded that he had been disabled since September 1, 1996 due to "Anxiety Related Disorder/Functional Nonpsychotic" (R. at 98).

In March 2002, Santorelli's psychologist Dr. Michael Beck stated in an affidavit that he had been treating Santorelli since September 1996 for post traumatic stress disorder with agoraphobia and panic attacks (R. at 31-32).[9] His symptoms included difficulty breathing, dry mouth, difficulty swallowing, sweating, heart palpitations, depression, and fear of loss of consciousness. Dr. Beck noted that when he first saw Santorelli in 1996, "it was clearly apparent to me that he had been ill for quite some time" (R. at 31). Dr. Beck also noted that in 1995 Santorelli developed chronic candidiasis syndrome, a recurring systemic fungal infection, which resulted in respiratory and digestive distress, chronic fatigue, nausea, hives, allergies and asthma (R. at 31). The doctor also noted exacerbations of asthma and sinus problems, concomitant anxiety, an inability to breathe, and food allergies (R. at 31-32). The doctor suggested that Santorelli remain at home (R. at 32).

In May 2002, Dr. Larmor sent a letter to SSA (R. at 23) stating that Dr. Congram had diagnosed Santorelli with adrenal insufficiency (or adrenal stress syndrome) based on laboratory tests which showed low urinary ketosteroids and ketogenic steroids. He stated that this

---

[9] The affidavit's purpose was to request that Santorelli be permitted to appear at his ALJ hearing by telephone (R. at 32).

syndrome manifests itself in symptoms including a low level of tolerance for all kinds of stress, a high level of generalized anxiety, panic attacks, phobias, fatigue, depression, weight loss, somatic symptoms, insomnia, heightened sensitivity to pain, respiratory and gastrointestinal disorders, allergic manifestations, eczemas, headaches and an incapacity to tolerate the stress of the normal workplace (R. at 23). Dr. Larmor stated that this "made it impossible for him to tolerate the stress and pace of the normal workplace so that during the years 1980 through 1988 and to this day he has not been able to hold a regular job. His is almost a classic, textbook case" (R. at 23). He stated further, "he is and has been seriously incapacitated and unable to engage in any substantial gainful employment during that time and to the present" (R. at 23).

IV.    Standard of Review

Judicial review of the Commissioner's final decision denying social security benefits is limited. Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998). It is not the Court's function to determine *de novo* whether a claimant was disabled. See Schaal v. Apfel 134 F.3d 496, 501 (2d Cir. 1998). Rather, the decision of the Commissioner must be affirmed, absent an error of law, if it is based upon substantial evidence, even if the Court might have ruled differently. See id.; 42 U.S.C. § 405(g).

Substantial evidence is "more than a mere scintilla," it is such that "a reasonable mind might accept as adequate to support [the] conclusion" being challenged. Richardson v. Perales, 402 U.S. 389, 401 (1971) (citations and internal quotation marks omitted). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the Court] will not substitute [its] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

However, the Court must reverse or remand a decision if the Commissioner fails to apply the correct legal standards or "scrupulously adhere" to a variety of procedural obligations in determining whether a claimant is disabled. Thomas v. Barnhart, No. 01 Civ. 518, 2002 WL 31433606, at *4 (S.D.N.Y. Oct. 30, 2002). "[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal." Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004) (citations and internal quotation marks omitted). See Schaal, 134 F.3d at 504 ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." (quoting Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987))).

Where, as here, the plaintiff is proceeding *pro se*, the Court "must make a searching investigation of the record to ensure that the claimant's rights were protected." Robinson v. Sec'y of Health and Human Serv., 733 F.2d 255, 258 (2d Cir. 1984) (citation and internal quotation marks omitted). The "reviewing court must determine whether the ALJ 'adequately protect[ed] the rights of [a] pro se litigant by ensuring that all of the relevant facts [are] sufficiently developed and considered.'" Echevarria v. Sec'y of Health and Human Serv., 685 F.2d 751, 755 (2d Cir. 1982) (quoting Hankerson v. Harris, 636 F.2d 893, 895 (2d Cir. 1980) (alterations in original).

A.    Review Pursuant to the Dixon and Stieberger Remedial Orders

Plaintiff was a class member of two (2) lawsuits which entitled him to a "full reopening" of his 1982 application for DIB and SSI. See generally Dixon v. Shalala, 54 F.3d 1019 (2d Cir. 1995); Stieberger v. Sullivan, 792 F. Supp. 1376, modified, 801 F. Supp. 1079 (S.D.N.Y. 1992).[10]

Pursuant to the Dixon court order, a "full reopening" of claims means that SSA is required readjudicate claims from the time of the earliest potential entitlement through the date of any future disability determination. See Dixon, 54 F.3d at 1037-38. Therefore, SSA was required to determine whether Plaintiff was disabled at any time from February 27, 1980 through August 31, 1996.

When a claim is readjudicated pursuant to Dixon, SSA must "make reasonable efforts to retrieve available, relevant administrative records for purposes of readjudicating the claims of class members." Id. at 1034. If records cannot be located for any class member, certain rebuttable presumptions apply, specifically,

> [a] class member whose records cannot be located will be presumed to be
> disabled if he or she received a decision awarding disability benefits for any
> period of disability subsequent to the one that forms the basis of class
> membership, and (1) it is medically reasonable to presume that he or she was
> disabled as of the date of the prior denial, or (2) he or she was 55 years of age or
> older at the time of the denial. Conversely, there will be a rebuttable presumption
> that a class member is not disabled if (1) he or she received a denial or
> termination of benefits subsequent to the one that forms the basis of class
> membership; [or] (2) he or she was employed for at least six months following
> the denial or termination.

Id. at 1034-35 (citations omitted). "If a class member's claims file cannot be found and the presumptions . . . are inapplicable . . . the class member will be required to submit evidence

---

[10] The Stieberger court order allowed claimants who met certain criteria to have their claims reopened and reviewed de novo. Stieberger, 792 F. Supp. at 1385-86.

pertaining to his or her condition during the period to be readjudicated."[11] Id. at 1035 (citations and internal quotation marks omitted). However, SSA must still "use its regular policies on evidence development to assist the class member in obtaining evidence relevant to the readjudication of his . . . claim. Id.

In this case, the ALJ did not consider whether the Dixon presumptions applied, but proceeded directly to the disability determination.

B.     Entitlement to Benefits

Title II of the Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). An individual may be determined to be "under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). To prove an impairment there must be support by evidence of medically accepted clinical and laboratory techniques. 42 U.S.C. § 423(d)(3). A claimant may show disability through a combination of impairments and the Commissioner must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe. 42 U.S.C. § 423(d)(2)(B).

---

[11] While the remedial order obligates SSA to make efforts to develop the record, it "does not relieve plaintiffs of the ultimate burden of proof." Dixon, 54 F.3d at 1037. SSA is not required to "reconstruct the names of doctors or medical centers which a particular claimant visited when the claimant is now unable to recall that information. Rather . . . SSA [is required] to contact only those doctors, medical centers, and hospitals specifically identified by claimants." Id. "If SSA writes letters to hospitals and doctors requesting records and comes up empty, SSA has discharged its assistance obligation. In such a case, it is the class member, not the government, who loses." Id. at 1037.

SSA regulations establish a five (5) step sequential analysis by which the Commissioner evaluates disability benefits claims. See 20 C.F.R. § 404.1520.[12] First, the Commissioner determines whether the claimant is performing substantial gainful work. See id. § 404.1520(b). Second, if the claimant is not performing substantial gainful work, the Commissioner determines whether he has a "severe impairment." See id. § 404.1520(c). Third, if the claimant has a severe impairment, the Commissioner considers medical evidence to determine if the claimant suffers from an impairment listed in appendix 1 of the regulations. See id. § 404.1520(d). If the claimant's impairment is listed, the Commissioner will automatically consider him disabled. See id. § 404.1520(d), (e). Fourth, if the claimant's impairment is not listed, the Commissioner analyzes whether the impairment prevents the claimant from doing his past work. See id. § 404.1520(e). Finally, if the claimant cannot perform past work, the Commissioner determines whether the impairment prevents him from doing any other work. See id. § 404.1520(f). If so, the Commissioner must find the claimant disabled. See, e.g., Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000). The claimant bears the burden of proof in the first four (4) steps of the analysis. If the claimant meets his burden, the burden of persuasion in the last step shifts to the Commissioner. 20 C.F.R. § 404.1520(f)(1).

When conducting the five (5) step sequential analysis, the Commissioner must consider: (1) objective medical facts and clinical findings; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability; and (4) claimant's educational background, age, and work experience. Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (citation omitted).

---

[12] SSA's five (5) step sequential evaluation process is listed in parallel regulations. See 20 C.F.R. §§ 404.1520 (governing claims for DIB), 416.920 (governing claims for SSI).



V.    Analysis

In this case, the ALJ determined that Plaintiff (1) had engaged in substantial gainful activity from 1986 to 1991 (part of the period in question) and was therefore ineligible for benefits during that time; (2) suffered from "severe impairments;" [13] (3) not listed in appendix 1; (4) did not have the residual functional capacity to perform his past work; but (5) was not disabled because he was capable of performing "light work."

Based on the administrative record before the Court, the ALJ did not fulfill his duty because his decision to deny Plaintiff benefits was not supported by substantial evidence and was based upon legal error.

A.    Duty to Develop the Record

In light of the informal, non-adversarial nature of a benefits proceeding, an ALJ, unlike a judge in a trial, must affirmatively develop the record, particularly in cases where there are evidentiary gaps and deficiencies in the record. 20 C.F.R. § 404.900(b); Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999). This duty exists even when a claimant is represented by counsel, Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996), but is particularly important when a claimant proceeds *pro se*. See Hankerson v. Harris, 636 F.2d 893, 895 (2d Cir. 1980) (ALJ has a heightened duty to *pro se* claimants "to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" to prevent prejudice to the claimant (citation and internal quotation marks omitted)). In fulfilling this obligation, "[a]n ALJ should make every reasonable effort to obtain treating source evidence, and if the treating source provides an incomplete report, the ALJ must request the necessary additional information from the treating source." Foster v.

---

[13] The ALJ found that these impairments included respiratory difficulties, asthma, and allergies (R. at 20).

Callahan, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998) (citations and internal quotation marks omitted).[14]

Based upon six (6) pages of what appear to be excerpts of a series of barely legible workers' compensation forms filled out between 1980 and 1983 by Plaintiff's now deceased treating physician, Dr. Congram (see R. at 50-55), the ALJ concluded Plaintiff was not disabled for the entire period of 1980 to 1996. Moreover, Dr. Congram's reports are "frequently incomplete or illegible and provide no coherent overview" of Plaintiff's condition or treatment. Pratts, 94 F.3d at 38. "Such a record offers . . . no basis to find the substantial evidence necessary to uphold the ALJ's decision." Id.

Although Dr. Larmor treated Plaintiff for approximately seventeen (17) years (R. at 23), the record contains only two (2) letters from him describing Plaintiff's condition. It was the ALJ's duty to seek additional information from Plaintiff's treating physician *sua sponte*. Schaal, 134 F.3d at 505. See Clark v. Commissioner of Social Security, 143 F.3d 115, 118 (2d Cir. 1998) ("If asked . . . the doctor might have been able to offer clinical findings in support of his conclusion. . . ."); Rosa, 168 F.3d at 80 ("[A] treating physician's failure to include [adequate] support for the findings in his report does not mean that such support does not exist; he might not have provided this information in the report because he did not know that the ALJ would consider it critical to the disposition of the case." (citations and internal quotation marks omitted)).

---

[14] To this end, the ALJ is authorized to issue subpoenas demanding the production of any evidence relating to a deficiency in the record. See 42 U.S.C. § 405(d) ("For the purpose of any hearing . . . authorized or directed under this subchapter, or relative to any other matter within the Commissioner's jurisdiction hereunder, the Commissioner of Social Security shall have the power to issue subpoenas requiring the attendance and testimony of witnesses and the production of evidence that relates to any matter under investigation or in question before the Commissioner of Social Security.").

There is no indication that the ALJ took the necessary steps to fill in the gaping holes in the record.[15] See Carroll v. Sec'y of Health and Human Serv., 705 F.2d 638, 644 (2d Cir. 1983) ("Nothing appears to have prevented the ALJ in the present case from calling as live witnesses [the doctors involved with the case]."). See also Rosa, 168 F.3d at 80 ("Having nevertheless failed to request any additional records or support from [the doctor], the ALJ was left to base her conclusions on incomplete information that was necessarily conclusive of very little. . . . Confronted with this situation, the ALJ should have taken steps directing [claimant] to ask [her doctor] to supplement his findings with additional information." (citations and internal quotation marks omitted)). Where, as here, there are gaps in the administrative record, remand to the Commissioner for further development of evidence is appropriate. See id. ("[T]he scant record before [the Court] reveals a host of lost opportunities for the ALJ to have developed the facts of this case before rejecting the disability finding made by [Plaintiff's] treating physician." (citations and internal quotation marks omitted)).

> 1.     Substantial Gainful Activity

In the first step of the disability analysis the ALJ determined that Plaintiff had engaged in substantial gainful activity from 1986 to 1991 and was therefore ineligible for benefits during that period (R. at 18). In reaching this conclusion, the ALJ misapplied the regulations and failed to make basic inquiries into the nature of Plaintiff's work.

"Substantial gainful activity" ("SGA") is defined as "work that involves doing significant and productive physical or mental duties and is done for pay or profit." 20 C.F.R. § 404.1510. Earnings are the primary criteria in establishing SGA. Id. § 404.1574(a)(1). Earnings which

---

[15] The extent of the ALJ's efforts seem to be that he advised Plaintiff that he should turn over any additional documents because those in the record were "brief" and that SSA could not find any additional documents (R. at 105).

averaged more than three hundred dollars ($300) per month from 1980 to 1989 and five hundred dollars ($500) per month from January 1990 to June 1999 ordinarily[16] establish that a claimant engaged in SGA. Id. § 404.1574(b)(2)(i). Earnings below one hundred ninety dollars ($190) per month from 1980 to 1989 and below three hundred dollars ($300) per month between 1990 and 2000 ordinarily show that a claimant has not engaged in SGA. Id. § 404.1574(b)(3). When earnings levels fall in between those ranges, an ALJ generally considers other factors including community standards and whether the work performed is clearly worth the amounts that ordinarily show that a claimant is engaged in SGA. Id. § 404.1574(b)(6)(i), (iii).

In this case, Plaintiff's FICA earnings statement indicated that his income was three thousand four hundred fifty three dollars ($3453.00) in 1986 (two hundred eighty seven dollars and seventy five cents ($287.75) average per month); three thousand seven hundred two dollars ($3702.00) in 1987 (three hundred eight dollars and fifty cents ($308.50) average per month); four thousand one hundred thirty six dollars ($4136.00) in 1988 (three hundred forty four dollars and sixty seven cents ($344.67) average per month); three thousand nine hundred nine dollars ($3909.00) in 1989 (three hundred twenty five dollars and seventy five cents ($325.75) average per month); three thousand eight hundred nine dollars ($3809.00) in 1990 (three hundred seventeen dollars and forty two cents ($317.42) average per month); and five thousand one hundred three dollars ($5103.00) in 1991 (four hundred twenty five dollars and twenty five cents ($425.25) average per month) (R. at 37).

Despite the fact that Plaintiff's reported income did not meet the minimum threshold levels in several years (1986, 1990 and 1991) and barely exceeded the minimums in the

---

[16] "The word 'ordinarily' implies that there can be exceptions and therefore the income levels of § 404.1574(b)(2) are intended to create only a rebuttable presumption of ability to engage in substantial gainful activity." Nazzaro v. Chater, 978 F. Supp. 452, 461 (W.D.N.Y. 1997) (citations omitted).

remaining years, the ALJ relied solely on the FICA statement to conclude that Plaintiff engaged in SGA in all years in which he had any reported income (R. at 18), thus misapplying the regulations.[17]

The regulations provide considerations, other than earnings, to be factored into the determination: whether the claimant's income is based on the value of his productivity (i.e., the SSA will only consider the amount a claimant "earns" and not any subsidies provided to him), 20 C.F.R. § 404.1574(a)(2); whether the claimant is working in a sheltered or special environment, id. § 404.1574(a)(3); whether the claimant's work attempts were unsuccessful as defined in the regulations, id. § 404.1574(c); how well the claimant performs, id. § 404.1573(b); and whether he can perform without special assistance, id. See also Goldstein v. Harris, 517 F. Supp. 1314, 1317 (S.D.N.Y. 1981) ("Earnings in excess of the specified amounts do not preclude a finding of disability, but merely create a rebuttable presumption of substantial and gainful activity. The ALJ must also consider the nature of the work performed, the adequacy of performance, any special employment conditions, and the amount of time spent working." (citation omitted)).

The ALJ did not consider any of these factors and Plaintiff's limited testimony did not provide the ALJ an adequate basis to ignore them (R. at 108). Failure to consider the various factors laid out in the regulations is grounds for remand. See generally Nazzaro v. Chater, 978 F. Supp. 452, 461-62 (W.D.N.Y. 1997).

On remand, the ALJ must consider the type of work in which Plaintiff engaged during the period in question; whether his income was based on the value of his productivity; whether

---

[17] In reaching his conclusion, the ALJ simply cited the portion of the regulations that gives a broad overview of the five (5) step process (20 C.F.R. §§ 404.1520 and 416.920) (R. at 18), but did not cite the sections that specifically deal with SGA and the threshold amounts for determining whether a claimant has engaged in SGA.

he worked in a sheltered or special environment; whether his work attempts were successful as defined in the regulations; how well he performed; and whether he was able to perform without special assistance.

        2.     Plaintiff's Capacity to Perform Alternative Substantial Gainful Work

In the fifth and final step of the disability analysis, the ALJ concluded that Plaintiff was "able to perform light work with environmental restrictions during the relevant period of time" (R. at 20)[18] and that the applicable medical vocational guidelines ("the grids") applied to preclude a finding of disability (R. at 20). This conclusion was not based on substantial evidence.

In this step, the Commissioner was required to produce evidence showing the existence of alternative substantial gainful work which exists in the national economy and which Plaintiff could perform, considering not only his physical capability, but as well his age, his education, his experience, and his training. Rosa, 168 F.3d at 77-78. Ordinarily, the Commissioner meets his burden at the fifth step by applying the grids. 20 C.F.R. Pt. 404, Subpt. P, App. 2; Rosa, 168 F.3d at 78. The grids take into account the claimant's age, education, and work experience. Rosa, 168 F.3d at 78. Based on these considerations, the grids indicate whether the claimant can engage in any substantial gainful work existing in the national economy. Id.

Here, the ALJ relied on two (2) factors in reaching his conclusion that Plaintiff was capable of light work. First, he concluded that "the claimant engaged in substantial gainful activity from 1986 to 1991 and was able to find a job with no exposure to environmental agents"

---

[18] Light work involves lifting no more than twenty (20) pounds at a time with frequent lifting or carrying of objects weighing up to ten (10) pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full range of light work, a claimant must have the ability to do substantially all of these activities. 20 C.F.R. § 416.967(b).

(R. at 19). Second, he relied on Dr. Congram's conclusion that "the claimant was able to return to work in an environment free of chemicals, odors and fumes" (R. at 19).[19]

First, as noted above, the ALJ's conclusion that Plaintiff engaged in SGA was erroneous and cannot serve as a basis for concluding that he was capable of light work.

Second, the ALJ's heavy reliance on Dr. Congram's reports, which span only 1980 to 1983, to conclude that Plaintiff was not disabled from 1980 to 1996, was misplaced. Reports that only cover a small fraction of the time period at issue do not constitute the substantial evidence necessary to conclude that Plaintiff was not disabled for the entire period. See Wagner v. Sec'y of Health and Human Serv., 906 F.2d 856, 861 (2d Cir. 1990) (in reference to "notes" that "take up a single page for the three years at issue. . . . It . . . cannot be seriously argued that they represent an exhaustive record of [claimant's] condition over the whole period"); Pratts v. Chater, 94 F.3d 34, 38 (2d Cir. 1996) (an "incomplete medical history . . . offers . . . no basis to find the substantial evidence necessary to uphold the ALJ's decision"). "The Commissioner cannot rely on evidentiary gaps concerning the claimant's residual functional capacity, but must instead present affirmative evidence to sustain its burden of proof that the claimant has such capacity." Rodriguez v. Apfel, No. 97 Civ. 9030, 1999 WL 511867, at *4 (S.D.N.Y July 19, 1999) (citing Rosa, 168 F.3d at 81, 83).

Additionally, while the grids are generally dispositive, exclusive reliance on them is inappropriate where they fail to describe the full extent of a claimant's physical limitations. In particular, "sole reliance on the [g]rid[s] may be precluded where the claimant's exertional

---

[19] The ALJ also noted that there was "no evidence of severe agoraphobia or panic attacks until claimant began treatment with Dr. Beck in 1996" (R. at 19). Presumably, this is a reference to the condition under which Plaintiff is currently considered disabled. In fact, Plaintiff is currently disabled due to an "anxiety" disorder. There is some evidence in the record that corroborates Plaintiff's claim that he suffered from debilitating anxiety throughout the entire period in question. In any event, lack of evidence because of an underdeveloped record is not a valid basis to make a finding of no disability.

impairments are compounded by significant nonexertional impairments that limit the range of sedentary work that the claimant can perform."[20] Rosa, 168 F.3d at 78 (citations and internal quotation marks omitted). Nonexertional limitations include, *inter alia*, difficulty functioning due to nervousness, anxiety or depression, as well as difficulty tolerating some physical features of certain work settings including dust and fumes. 20 C.F.R. §§ 404.1569a(c)(i), (v).

When a claimant's nonexertional impairments significantly diminish his ability to work, "the [Commissioner] must introduce testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain or perform." Pratts, 94 F.3d at 39 (citations and internal quotation marks omitted). This is because "the grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments. . . . Accordingly, where the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment the application of the grids is inappropriate." Id. (citations and internal quotation marks omitted).[21]

In this case, the ALJ recognized that Dr. Congram noted that Plaintiff had nonexertional limitations,[22] specifically, sensitivity to dust and fumes. Nevertheless, the ALJ failed to call a vocational expert or require the Commissioner to present other evidence that substantial gainful work was available to Plaintiff despite his nonexertional limitations. The regulations specifically

---

[20] "An exertional limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (i.e., sitting, standing, walking, lifting, carrying, pushing, and pulling). A nonexertional limitation is one imposed by the claimant's impairments that affect [his] ability to meet the requirements of jobs other than strength demands." Rosa, 168 F.3d at 78 n.2 (citations and internal quotation marks omitted).

[21] "A claimant's work capacity is 'significantly diminished' if there is an 'additional loss of work capacity . . . that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'" Pratts, 94 F.3d at 39 (quoting Bapp v. Bowen, 802 F.2d 601, 606 (2d Cir. 1986).

[22] Neither the ALJ nor Dr. Congram use the term "nonexertional liminations," however, both make reference to the type of limitations that are generally considered to fall into this category.

direct that SSA will *not* apply the grids when nonexertional limitations are a factor, yet the ALJ relied solely on the grids anyway.[23] See 20 C.F.R. § 404.1569a(d) ("If your impairment(s) and related symptoms . . . affect your ability to meet both the strength and demands of jobs other than the strength demands, we *will not directly apply the rules in appendix 2* . . . ." (emphasis added)).

Based upon the foregoing, remand to the Commissioner is appropriate. Rosa, 168 F.3d at 83. On remand, the ALJ must adequately develop the record to determine whether Plaintiff was capable of performing light work and must reevaluate "whether the Commissioner has demonstrated that [Plaintiff's] ability to perform the full range of light work was not significantly diminished by his nonexertional impairments. If the ALJ finds that [Plaintiff's] ability is significantly diminished, then the Commissioner should be required to present the testimony of a vocational expert or other evidence concerning the existence of jobs in the national economy for an individual with [Plaintiff's] limitations." Pratts, 94 F.3d at 39. See id. (concluding that the ALJ erred in proceeding "directly to the ultimate question of disability without first considering whether further testimony was necessary in light of [the claimant's] nonexertional impairments").

B.      Weight Given to the Treating Physicians' Opinions

Finally, although the ALJ acknowledged that he received three (3) additional statements from Plaintiff's doctors, he does not explain what weight, if any, he gave to those documents. This constitutes legal error.

In analyzing a treating physician's report, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." Rosa, 168 F.3d at 79 (citations and internal

---

[23] Notably, the ALJ did not cite the section of the regulations relating to nonexertional limitations.

quotation marks omitted). The opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence. Id. at 78-79. See also 20 C.F.R. § 404.1527(d)(2). When a treating physician's opinion is given less than controlling weight, the ALJ must provide the claimant with good reasons for doing so. Id. § 404.1527(d)(2). Further, the ALJ must consider certain factors to determine how much weight to give to that opinion including: (1) frequency of examination, length, nature and extent of the treatment relationship; (2) evidence in support of the treating physician's opinion; (3) consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors that are brought to the attention of the SSA that tend to support or contradict the opinion. Id. §§ 404.1527(d)(2)(i)-(ii), (d)(3)-(6).

The ALJ gave controlling weight to Dr. Congram's reports, despite the fact that Dr. Congram only treated Plaintiff for three (3) of the sixteen (16) years in question. Plaintiff's treating physician for the vast majority of the period, from 1985 to at least 2002, was Dr. Larmor (R. at 23). The only medical evidence for the period from 1983 through August 1996, indicates that Plaintiff may have been disabled during that time,[24] but the record in this case is woefully underdeveloped. While the ALJ noted Dr. Larmor's conclusions (R. at 18), he did not provide a reason for disregarding the opinion of Plaintiff's doctor of almost two (2) decades. No reason is not a "good reason." See Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for

---

[24] Based on his assessment of Dr. Congram's reports as well as the report of another doctor (which is not in the record), Dr. Larmor concluded that Plaintiff was "seriously incapacitated and unable to engage in any substantial gainful activity during that time" (R. at 23). A treating physician's retrospective medical assessment of a patient may be probative when based upon clinically acceptable diagnostic techniques. Perez, 77 F.3d at 48.

remand." (quoting Schaal, 134 F.3d at 505)).[25] See generally Peralta v. Barnhart, No. 04-CV-4557, 2005 WL 1527669, at *10-11 (E.D.N.Y. June 22, 2005); Miller v. Barnhart, No. 03 Civ. 2072, 2004 WL 2434972, at *8 (S.D.N.Y. Nov. 1, 2004). Furthermore, nowhere does the ALJ address the various factors that he was required to consider in reaching his conclusion to accord no weight to Dr. Larmor's conclusions.

Additionally, the ALJ did not acknowledge Dr. Beck's conclusion that Plaintiff "had been ill for quite some time" prior to his disability determination in 1996 (R. at 31).[26] Instead, the ALJ simply noted that there was no evidence of severe agoraphobia or panic attacks until Plaintiff began treatment with Dr. Beck (R. at 19). The relevance of this conclusion is unclear, as SSA found Plaintiff disabled due to anxiety.

In failing to provide reasons for disregarding the conclusions of Plaintiff's doctors and failing to analyze the various factors used to determine how much weight to give a treating physician's opinion, the ALJ committed legal error.

On remand, once the record is adequately developed, the ALJ must consider the various factors noted above, to determine how much weight, if any, to give to the conclusions of Plaintiff's doctors. If the ALJ decides to give less than controlling weight to any opinion, he must provide "good reasons" for his conclusions.[27]

---

[25] If medical assessments are inconsistent, it is the ALJ's affirmative duty to resolve the conflicts, see Veino, 312 F.3d at 588, by seeking out more information for the treating physician and to develop the administrative record accordingly, Clark, 143 F.3d at 118.

[26] A psychologist's opinion may be accorded the same degree of weight as a medical doctor. See Trostel ex rel. Murray v. Bowen, 695 F. Supp. 1418, 1421 (E.D.N.Y. 1988).

[27] "Where application of the correct legal standard could lead to only one conclusion, [the Court] need not remand. However, on this record [the Court] cannot say with certainty what weight should be assigned . . . to the opinion of plaintiff's treating physician . . . . It is for the SSA . . . to weigh the conflicting evidence in the record." Schaal, 134 F.3d at 504 (citation omitted).

VI.    Conclusion

The ALJ's conclusion that Plaintiff was not disabled at any time during the relevant period was not supported by substantial evidence and was based upon legal error. Accordingly, the Commissioner's motion for judgment on the pleadings is DENIED. The case is remanded to the Commissioner for further administrative proceedings consistent with this Opinion and Order. The Clerk of the Court is directed to close this case.


IT IS SO ORDERED.


_____
Sandra J. Feuerstein
United States District Judge

Dated: August 8, 2007
       Central Islip, New York

Copies to:

Thomas Santorelli
94 Fourth Avenue
Suite 203
Bay Shore, NY 11706


Diane C. Leonardo-Beckmann
United States Attorneys Office, EDNY
610 Federal Plaza
Central Islip, NY 11722